# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAINT JERMAINE ENDELEY *Plaintiff*, v. UNITED STATES DEPARTMENT OF DEFENSE and NATIONAL CLANDESTINE SERVICE, *Defendants*. | Civil Action No. 17-733 (RDM) |

## MEMORANDUM OPINION

On April 6, 2017, the United States fired fifty-nine Tomahawk cruise missiles at the Al Shayrat airfield in Syria. *See* Statement from Pentagon Spokesman Capt. Jeff Davis on U.S. Strike in Syria, Release No. NR-126-17 (Apr. 6, 2017).[1] In a statement announcing the missile strike, President Trump explained that Syria had "launched a horrible chemical weapons attack" on its own citizens and that, in response, he had "ordered a targeted military strike on the airfield in Syria from where the chemical attack was launched." Statement by President Trump on Syria, White House, Office of the Press Secretary (Apr. 6, 2017).[2] The purpose of the missile strike, as President Trump further explained, was "to prevent and deter the spread and use of deadly chemical weapons." *Id.* President Trump did not seek authorization from Congress before

---

[1] *Available at* https://www.defense.gov/News/News-Releases/News-Release-View/Article/1144598/statement-from-pentagon-spokesman-capt-jeff-davis-on-us-strike-in-syria (last visited Aug. 2, 2017).

[2] *Available at* https://www.whitehouse.gov/the-press-office/2017/04/06/statement-president-trump-syria (last visited Aug. 2, 2017).

ordering the strike, nor did he identify any preexisting congressional authorization for the use of military force.

Four days after the strike, plaintiff Saint Jermaine Endeley filed this *pro se* action against the Department of Defense and the National Clandestine Service of the Central Intelligence Agency.[3] *See* Dkt. 2. Plaintiff alleges that the missile strike "was unconstitutional under [t]he War Powers Resolution because the President did not seek approval from Congress;" that "[t]he office of the President has publicly admitted more military action is to follow;" and that "[t]he President does not have authority to launch a war in Syria without a resolution from Congress." *Id*. at 3. In addition, he alleges that "[t]he Department of Defense illegally used [t]he Patriot Act and unconstitutionally expanded [its] authority under the provisions of the law." *Id.* Plaintiff requests that the Court issue an "injunction ending military action against the government of Syria" and barring "any further military action . . . without approval from Congress through a resolution." *Id.* at 4.

Viewing the complaint in the light most favorable to Plaintiff, the Court concludes that it fails to allege facts sufficient to establish subject matter jurisdiction. Accordingly, the Court will, on its own motion, **DISMISS** the action for lack of jurisdiction.[4]

---

[3] Although the caption of the complaint refers to the National Clandestine Service, the substantive averments of the complaint make no mention of it.

[4] The Court concludes that Plaintiff has established that he is "unable to pay [the filing] fee[]" typically required to initiate a civil action in this court, 28 U.S.C. § 1915(a)(1); *see also id.* § 1914, and will therefore grant Plaintiff's motion to proceed *in forma pauperis, see* Dkt. 1.

# I. BACKGROUND

A. **Factual Background**

Plaintiff commenced this action on April 10, 2017, by filing suit in the United States District Court for the Southern District of New York. Dkt. 2. He alleges that four days earlier, "[o]n April 6, 2017, [t]he defense department launched approximately [fifty-nine] Tomahawk missiles into Syria as a response to President Bashir Al-Assad's recent chemical attack on civilians." *Id.* at 3. This "attack" represented "part of [President Trump's] strategy of deterrence against the use of chemical weapons by the Syrian government" and, according to Plaintiff, resulted in the "destr[uction] [of] an airbase that belonged to a Syrian government institution." *Id.* He further alleges that the President "did not seek approval from Congress" before ordering the strike, *id.*, and that allegation is indisputably correct. As the President explained in his notice to Congress (which is subject to judicial notice, *see* Fed. R. Evid. 201), in ordering the strike, he relied on his "constitutional authority to conduct foreign relations and" to serve "as Commander in Chief and Chief Executive." Letter from the President to the Speaker of the House and the President Pro Tempore of the Senate (Apr. 8, 2017).[5] In that same notice, moreover, the President cautioned that he was prepared to "take additional action, as necessary and appropriate, to further [the] important national interests" of the United States. *Id.* Expanding on that statement, Plaintiff avers that "the office of the President has publicly admitted more military action is to follow." Dkt. 2 at 3.

Recognizing the need to plead facts sufficient to establish Article III standing, Plaintiff alleges that Defendants' actions have caused him to "suffer[]" injury. *Id.* In particular, he

---

[5] *Available at* https://www.whitehouse.gov/the-press-office/2017/04/08/letter-president-speaker-house-representatives-and-president-pro-tempore (last visited Aug. 2, 2017).

contends that "[his] firm has a diplomatic mission to remove President Assad by delegitimizing his government and ensuring a free election where the Syrian people can elect a new leader" and that, in pursuit of this mission, "[his] firm is currently [engaged] in lobbying efforts with the United States government and [the] United Nations." *Id.* Those efforts have been "complicate[d]" by the April 6 strike, according to Plaintiff, because "[t]he government of Syria is less likely to listen to United States officials if" U.S. military forces are "attacking [Syrian] government institutions." *Id.* He asserts that both the airstrikes and the potential for further attacks on Syrian government institutions have "create[d] more obstacles to an eventual peace deal" and have thus required that his firm devote additional "time, labor, and money" to the firm's "diplomatic mission." *Id.* Finally, Plaintiff alleges that he has "spent significant time, labor, [and] money on ensuring good government practices in the United States government" and that "it is [his] job to regulate administrative agencies when they act unconstitutionally." *Id.*

On April 11, 2017, the United States District Court for the Southern District of New York transferred Plaintiff's suit to this Court pursuant to 28 U.S.C. § 1406(a) on the ground that venue is proper here but not in New York. Dkt. 3 at 2. The transferring court did not rule on Plaintiff's pending motion for leave to proceed *in forma pauperis*, *see* Dkt. 1, noting that "[w]hether [Plaintiff] should be permitted to proceed further without payment of fees is a determination to be made by the transferee court," Dkt. 3 at 2. Although it is the Court's responsibility to effect service on behalf of litigants proceeding *in forma pauperis*, 28 U.S.C. § 1915(d), the Court has postponed doing so pending its evaluation of the threshold jurisdictional issues discussed below.

**B.** **Plaintiff's Claims**

Plaintiff's claims require some parsing. To start, it is unclear whether he intends to assert a stand-alone claim under Article I, Section 8 of the Constitution,[6] or, instead, merely intends to assert statutory claims. He alleges, for example, that the missile strike "was unconstitutional *under [t]he War Powers Resolution*" and that "[t]he Executive Branch acted without constitutional authority required *under [t]he War Powers Resolution*." Dkt. 2 at 3 (emphases added). Although one might reasonably construe these allegations only to assert a claim "under the War Powers Resolution," and not a separate claim under Article I, Section 8, the Court is required to construe Plaintiff's *pro se* complaint liberally, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and, accordingly, will assume that he intends to allege both statutory and constitutional claims.

Plaintiff also asserts that the United States' missile strike on Syria was an "unconstitutional[] expan[sion] [of] [Defendants'] authority under the provisions of the" USA PATRIOT Act. Dkt. 2 at 3. The USA PATRIOT Act, however, does not address the President's authority (or the Department of Defense's authority) to use military force. Once again construing Plaintiff's *pro se* complaint liberally, however, the Court will assume that he actually intends to reference the Authorization for Use of Military Force ("AUMF"), Pub. L. No. 107-40,

---

[6] *See* U.S. Const. art. I, § 8, cl. 1 (congressional powers to tax, pay debts, "and provide for the common Defence and general Welfare of the United States"); *id.* cl. 11 (congressional power to "declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water"); *id.* cls. 12 & 13 (congressional powers to "raise and support Armies" and "provide and maintain a Navy"); *id.* cl. 14 (congressional power to "make Rules for the Government and Regulation of the land and naval Forces"); *id.* cl. 15 (congressional power to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions"); *id.* cl. 16 (congressional power to "provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States").

115 Stat. 224 (2001), enacted by Congress the week after the September 11th terrorist attacks. The AUMF authorizes the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons." Pub. L. No. 107–40, § 2(a). So construed, Plaintiff's complaint alleges that the missile strike on "an airbase that belonged to a Syrian government institution" went beyond the scope of the AUMF, which (he says) authorizes the President to "attack terrorist organizations that target the United States" but does not permit "an attack on another government." Dkt. 2 at 3.

Thus, liberally construed, Plaintiff's complaint alleges that the President's use of force to attack the Al Shayrat airfield, and his threat to use additional force "as necessary and appropriate . . . to further [the] important national interests" of the United States, exceeded and threatens further to exceed his authority under Article 1, § 8 of the Constitution, the War Powers Resolution, and the AUMF. As redress, Plaintiff seeks a "court injunction ending military action against the government of Syria and a limitation on Presidential authority to expand the [AUMF]." *Id.* at 4. In addition, he asks the Court to prohibit the Department of Defense from "begin[ning] any further military action against the government of Syria without approval from Congress through a resolution" and to order the Department to "submit a plan to Congress detailing their military operations in Syria against terrorist organizations." *Id.*

## II. ANALYSIS

In every case, the Court must satisfy itself that it has subject matter jurisdiction. *See LeFande v. District of Columbia*, 841 F.3d 485, 492 (D.C. Cir. 2016). Plaintiffs bear the burden of establishing the Court's jurisdiction, and the nature of that burden varies depending on the

6

stage of the proceeding. *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (explaining that "[t]he party invoking federal jurisdiction bears the burden of establishing" the court's jurisdiction "in the same way as any other matter on which [it] bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation").

Here, Plaintiff has merely filed a complaint; the complaint has not yet been served, and counsel for Defendants has yet to appear. The fact that this case is at its earliest stage, however, does not mean that the Court need not consider whether it has jurisdiction. To the contrary, as the D.C. Circuit has observed, "a district court may dismiss a complaint *sua sponte* prior to service on the defendants pursuant to Fed. R. Civ. P. 12(h)(3) when . . . it is evident that the court lacks subject matter jurisdiction." *Evans v. Suter*, No. 09-5242, 2010 WL 1632902, at *1 (D.C. Cir. Apr. 2, 2010) (unpublished) (per curiam); *see also, e.g.*, *Hurt v. U.S. Court of Appeals for the D.C. Circuit Banc*, 264 Fed. App'x 1 (D.C. Cir. Jan. 24, 2008) (unpublished) (per curiam) (same); *Wiley v. Wilkins*, 134 F. Supp. 3d 308, 309 (D.D.C. 2015) (same); *Weisser v. Obama*, No. 13-cv-1257, 2013 WL 4498980, at *1 (D.D.C. Aug. 21, 2013) (same); *Caldwell v. Kagan*, 777 F. Supp. 2d 177, 179 (D.D.C. 2011) (same). When making this assessment based on the complaint alone, the Court must, of course, "accept as true all factual allegations contained in the complaint," *Smith v. Obama*, 217 F. Supp. 3d 283, 289 (D.D.C. 2016) (quoting *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007)), and must "draw all reasonable inferences in favor of the plaintiff," *Kucinich v. Obama*, 821 F. Supp. 2d 110, 114 (D.D.C. 2011).

Assessing the Court's subject matter jurisdiction begins with Article III of the Constitution, which vests federal courts with authority to adjudicate "Cases" and "Controversies." U.S. Const. art. III, § 2. Because federal courts are courts of limited

jurisdiction, this grant of power also marks the outer boundary of their authority to act. "In an attempt to give meaning" to the case or controversy requirement, "courts have developed a series of principles termed 'justiciability doctrines,' among which are standing[,] ripeness, mootness, and the political question doctrine." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)). All four of these doctrines are germane to the present case.

First, the "Court lacks power to resolve a dispute unless [the] plaintiff has standing." *Abulhawa v. U.S. Dep't of the Treasury*, No. 15-cv-2186, --- F. Supp. 3d ---, 2017 WL 883609, at *4 (D.D.C. Mar. 4, 2017). At the motion to dismiss stage, this means that Plaintiff "must . . . allege a 'concrete and particularized' injury that is 'fairly traceable to the challenged action of the defendant[s]' and 'likely' to be 'redressed by a favorable decision.'" *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017) (quoting *Lujan*, 504 U.S. at 560–61). Moreover, although the Supreme Court has "always insisted on strict compliance with [the] jurisdictional standing requirement," it has demanded an "especially rigorous" inquiry in cases requiring the courts "to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997); *see also Smith*, 217 F. Supp. 3d at 289 (quoting same in discussing standing to challenge the President's use of military force). Even drawing all inferences in Plaintiff's favor, his complaint fails this test.

Plaintiff does not allege that he has been "ordered into a war that [he] contend[s] is illegal," *Smith*, 217 F. Supp. 3d at 296, or that his property was damaged or destroyed, *cf. El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 837 (D.C. Cir. 2010). Rather, he alleges that "[his] firm is currently [engaged] in lobbying efforts with the United States government and [the] United Nations on bringing an end to President Assad's government and liberating the

8

Syrian people" and that U.S. "military action against the Syrian government only created more obstacles to an eventual peace deal." Dkt. 2 at 3. The imposition of these additional obstacles, according to the complaint, has "complicate[d]" the mission of Plaintiff's firm, resulting in additional expenditures of "time, labor, and money." *Id.* Plaintiff further alleges, moreover, that his work "includes military conflicts and the legality of Department of Defense actions in these conflicts." *Id.* From this, he posits that "it is [his] job to regulate administrative agencies when they act unconstitutionally" and that these efforts have required "significant time, labor, [and] money" in order to "ensur[e] good government practices in the United States government." *Id.*

None of these allegations rise to the level required to sustain Article III standing. An "injury in fact" sufficient to satisfy Article III must be "actual or imminent, not conjectural or hypothetical." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting *Lujan*, 504 U.S. at 560). Because Plaintiff seeks only prospective injunctive relief, he "must [allege facts sufficient to show] that he . . . 'is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983); *see also Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016) ("[W]here a plaintiff 'seeks prospective . . . injunctive relief, he must establish an ongoing or future injury that is *certainly impending*; he may not rest on past injury.'" (emphasis added) (quoting *Arpaio*, 797 F.3d at 19)). And he must also alleges facts sufficient to show that it is "likely, as opposed to merely speculative, that [any such imminent] injury [would] be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal quotation marks omitted).

Aside from one line in his complaint in which he alleges that "the office of the President has publicly admitted [that] more military action is to follow" in Syria, Dkt. 2 at 3, Plaintiff's complaint is devoid of any allegations of "likely" future injury. This is not a case—like

9

*Massachusetts v. Laird*, 451 F.2d 26 (1st Cir. 1971), to take one example—involving an armed conflict lasting months, years, or decades. To be sure, the United States has been involved in an extended armed conflict with the Islamic State of Iraq and the Levant ("ISIL") in the region. *See*, *e.g.*, Statement by the President on ISIL (Sept. 10, 2014).[7] But that is not what Plaintiff challenges. Rather, he challenges the legal authority of the Department of Defense—and, presumably, the President—to take "military action against the Syrian government," and, as to that use of force, he identifies only the April 6, 2017, missile strike on the Al Shayrat airfield. *See* Dkt. 2 at 3. The prospect that another, similar strike will occur in the foreseeable future (and without congressional authorization) is, by any measure, speculative. On top of that speculation, moreover, the complaint asks that the Court speculate that Plaintiff will be involved in lobbying "the United States government and [the] United Nations on bringing an end to President Assad's government and liberating the Syrian people" at that time; that whatever use of force that might occur would "complicate[]" his lobbying effort; and that he and his firm might achieve their desired result (with a less "significant" expenditure of "time, labor, and money") but for some future U.S. military operations. *Id.* Such "speculation upon speculation" does not suffice to support Article III standing.[8] *See Abulhawa*, 2017 WL 883609, at *7.

---

[7] *Available at* https://obamawhitehouse.archives.gov/the-press-office/2014/09/10/statement-president-isil-1 (last visited Aug. 2, 2017). *See also* Letter from the President to the Speaker of the House of Representatives and the President Pro Tempore of the Senate (June 6, 2017) ("As part of a comprehensive strategy to defeat ISIS, U.S. Armed Forces are conducting a systematic campaign of airstrikes and other necessary operations against ISIS forces in Iraq and Syria."), *available at* https://www.whitehouse.gov/the-press-office/2017/06/06/text-letter-president-speaker-house-representatives-and-president-pro (last visited Aug. 2, 2017).

[8] Plaintiff's contention that it is his "job to regulate administrative agencies when they act unconstitutionally," Dkt. 2 at 3, is both conclusory and bewildering; nothing in Article III vests courts with authority to adjudicate claims in the absence of a concrete and particularized injury to the plaintiff.

The speculative nature of Plaintiff's allegations also implicates the second relevant jurisdictional hurdle—the ripeness requirement. "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies.'" *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–149 (1967)); *see also Devia v. Nuclear Regulatory Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007). The doctrine is premised, in part, on Article III's case or controversy limitation and, in part, on prudential considerations "for refusing to exercise jurisdiction." *Nat'l Park Hospitality Ass'n*, 538 U.S. at 808 (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993)). "[E]ven in a case raising only prudential concerns," however, "the question of ripeness may be considered on a court's own motion." *Id.*

As a "constitutional minim[um]," the ripeness doctrine—like, and closely akin to, the standing doctrine—excludes claims seeking relief for future injuries that are hypothetical or speculative. *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999). Thus, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted). Courts, moreover, must go beyond this "constitutional minim[um] and take into account prudential concerns[,] which in some cases may mandate dismissal even if there is not a constitutional bar to the exercise of [their] jurisdiction." *Wyo. Outdoor Council*, 165 F.3d at 48. These concerns, in turn, require consideration of "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Abbott Labs*, 387 U.S. at 149; *see also Texas*, 523 U.S. at 301 (same). "The 'primary focus' of the prudential aspect of the ripeness doctrine is to balance 'the petitioner's

interest in prompt consideration of allegedly unlawful [government] action against the [government's] interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting.'" *Wyo. Outdoor Council*, 165 F.3d at 49 (quoting *Eagle-Picher Indus. v. EPA*, 759 F.2d 905, 915 (D.C. Cir. 1985)).

Plaintiff's claims fail at every step of this analysis. For the same reasons the he has failed to allege facts sufficient to establish standing, he has failed to identify any non-speculative dispute that is ripe for adjudication. That is, he has not alleged any facts that would permit the Court to conclude that any "future" use of force against the government of Syria is likely to "occur as anticipated, or indeed" that it will "occur at all." *Texas*, 523 U.S. at 300 (internal quotation marks omitted). Nor has he alleged facts that would render the dispute "fit" for resolution; it is asking far too much to seek to embroil the federal courts in a dispute about the scope of the President's authority to use military force based on nothing more than assumptions about what a foreign government *might* someday do and how the President and Congress *might* respond. If there were ever a case that is not "fit" for judicial resolution, this is it. And, finally, Plaintiff's current hardship is far too amorphous and tenuous to survive the ripeness inquiry. This is not a case, like *Abbott Labs* for example, in which the government has taken an action "that has a direct effect on the day-to-day business" of Plaintiff or his firm. 387 U.S. at 152. The April 6 airstrike is history. The sole question, then, is whether some ongoing conduct or imminent future action is causing Plaintiff a concrete hardship, and he alleges no facts that would allow the Court to draw such a conclusion.

The flip side of the ripeness doctrine is mootness. This rule has obvious application to Plaintiff's contention that the April 6 missile strikes were themselves unlawful. Plaintiff does

not—and could not—seek monetary relief, and the Court cannot enjoin or otherwise provide a non-monetary remedy (such as declaratory relief) for a past event. The only possible escape from this dilemma is the "the rule regarding issues capable of repetition, yet evading review." *Campbell v. Clinton*, 203 F.3d 19, 33 (D.C. Cir. 2000) (Randolph, J., concurring in the judgment) (internal quotation marks omitted). That rule applies where "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party w[ill] be subjected to the same action again." *United Bhd. of Carpenters & Joiners of Am., AFL-CIO v. Operative Plasterers' & Cement Masons' Int'l Assoc. of the U.S. & Can., AFL-CIO*, 721 F.3d 678, 687 (D.C. Cir. 2013) (citation and internal quotation marks omitted). Of particular relevance here, "the 'wrong' that is, or is not, 'capable of repetition' must be defined in terms of the precise controversy it spawns, to wit, in terms of the legal questions it presents for decision." *Id.* at 688 (internal quotation marks and alteration omitted). The Court doubts that there is a "reasonable expectation" that "the precise controversy" at issue will recur. But, given the array of other bases for concluding that Plaintiff has not presented a justiciable controversy, the Court need not decide that issue.

Finally, Plaintiff's request that the Court opine in the abstract on the scope of the President's authority to employ military force runs afoul of yet another justiciability canon—the "political question" doctrine. That "doctrine 'excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.'" *Smith*, 217 F. Supp. 3d at 297 (quoting *El-Shifa Pharm. Indus. Co.*, 607 F.3d at 840). A claim presents a political question if any *one* of the following factors, *see El-Shifa Pharm. Indus. Co.*, 607 F.3d at 841, is present:

13

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962). Although "[d]isputes involving foreign relations . . . are quintessential sources of political questions," *El-Shifa Pharm. Indus. Co.*, 607 F.3d at 841 (internal quotation marks omitted), it would be a mistake to assume "that every case or controversy which touches foreign relations lies beyond judicial cognizance," *id.* (quoting *Baker*, 369 U.S. at 211), or that "in the context of military action, the courts" will never "have a role," *id.* Rather, courts must approach questions touching on foreign relations and national defense with particular attention to the relevant context and the respective spheres of competence of the coordinate branches of government.

Judges in this circuit have taken different views on the application of the political question doctrine to disputes challenging the President's use of military force. *Compare Campbell*, 203 F.3d at 24–25 (Silberman, J., concurring) (concluding that, because the plaintiffs' claims under the War Powers Clause and the War Powers Resolution "implicat[ed] the political question doctrine," their claims were "not justiciable" in that case, and were, moreover, "generally unsuited to judicial resolution"), *with id.* at 37 (Tatel, J., concurring) (concluding that, if the challenge had been "brought by plaintiffs with standing," the court "could determine" whether the President's "air campaign in Yugoslavia . . . exceeded his authority under the Constitution or the War Powers Resolution"). The Court, however, need not step into this fray,

because this case implicates the concerns underlying the political question doctrine under any plausible application.

Given the inherent uncertainty in determining whether the President might seek to use force against the Syrian government in the future, and, if so, under what circumstances he might do so, the Court cannot address the merits of Plaintiff's claims without unduly treading on the domain of a coordinate branch of government. In speculating about what the Syrian government *might* do and how the President *might* respond, the Court could not avoid injecting itself into the most sensitive issues of foreign affairs and national security; it could not avoid inserting itself into the policy-making process; and it could not avoid the risk that its pronouncements might prove both unnecessary and at odds with the judgments of those charged with speaking for the United States in foreign affairs. *See Baker*, 369 U.S. at 217. Most manifestly, it is not the Court's role to provide its views, in the absence of a concrete case or controversy, about the scope of the President's authority. As then-Chief Justice Jay explained long ago, that responsibility is textually committed to those employed in the executive branch to advise the President. *See* 4 The Founders' Constitution, Art. 3, Cl. 1, Doc. 34 (Letter of Aug. 8, 1793, from Chief Justice John Jay to President George Washington).

Although the edges of the political question doctrine may, at times, be fuzzy, this is not a close case. The Court, accordingly, concludes that Plaintiff's request that the Court establish "limitation[s] on Presidential authority" under the AUMF; enjoin the Department of Defense from taking "any further military action against the government of Syria without approval from Congress;" and "limit the President's power to declare war against another government that has not attacked the United States," Dkt. 2 at 4, is also precluded by the political question doctrine.

15

## CONCLUSION

The Court will, accordingly, **GRANT** Plaintiff's motion for leave to proceed *in forma pauperis*, Dkt. 1, and will **DISMISS** the action for lack of jurisdiction.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: August 3, 2017